**FILED - GR**

July 6, 2020 10:51 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:ns   SCANNED BY: TB 7/6/2020

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

---

UNITED STATES OF AMERICA, )
    Respondent, )
                         )
                         )
vs.                         )    Case No. 2:10-CR-0008
                         )
ERIC DEXTER WELCH, )
    Movant. )

---

## BRIEF IN SUPPORT OF MOTION TO MODIFY SENTENCE

---

COMES NOW, **Eric Welch**, providing support for his Motion seeking a Sentence Modification, under 18 U.S.C. § 3582(c)(1)(A)(i)'s "extraordinary and compelling circumstances" provision. The reasons that Movant requests a Sentence Modification are as follows:

1. The COVID-19 pandemic penetrated federal prisons and it threatens inmates like Mr. Welch who have "at-risk" health concerns. There is no vaccine or cure for this deadly disease.

2. Several uncommon post-incarceration §3553(a) factors demonstrate that Mr. Welch has long-since directed responsibility upon himself for why he offended, and provides evidence that he is less likely to re-offend than a member of

the general public.

3. Consideration for time spent at liberty for three years:
Simple or mere negligence on behalf of the state-federal
governments joint lack of coordination caused a delay in the
federal prosecution and may entitle him to credit against his
sentence. While erroneously at liberty he led a reformed life.


I   STANDARDS


**TITLE 18 UNITED STATES CODE SECTIONS 3582(c)(1)(A)(i) and
3553(a)**

The Bureau of Prisons ("BOP") has had the sole power to
provide compassionate releases. BOP Program Statement No.
5050.50, <u>Compassionate Release/Reduction in Sentence:
Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and
4205(g)</u>, provides guidance on the types of circumstances that
present extraordinary or compelling reasons, such as "the
inmate's terminal medical condition; debilitated medical
condition; status as a 'new law' elderly inmate, an elderly
inmate with medical conditions, or an 'other elderly inmate;'
the death or incapacitation of the family member caregiver of
the inmate's child; or the incapacitation of the inmate's spouse
or registered partner." [Exhibit: A]. (That policy statement
may not be exhaustive, since it does not appear to have been
updated with the Sentencing Commission's policy subdivision "D"
in mind.)

In any event, the Bureau of Prisons has declined to seek relief in these situations. In 2018, Congress responded by eliminating the BOP's gate-keeping function by passing the First Step Act ("FSA 2018"). Inmates still need to exhaust administrative remedies in order to satisfy ripeness. [Exhibit A]. In situations like this, United States v. Alam, Sixth Circuit Appeal No. 20-1298 (May 2020), says that if the warden takes longer than 30 days to respond, Mr. Welch may file a § 3582. Alam described the amendments to § 3582(c)(1)(A) enacted by passage of the First Step Act of 2018, Section 603. This permits defendants to move a sentencing court for modification of sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" FSA 2018, § 603. (Emphasis added.)

The United States Sentencing Commission's policy currently indicates that a court can only grant a compassionate release "upon motion of the director of the Bureau of Prisons." The guidelines then outline four situations where relief is appropriate. The U.S. Sentencing Commission policy subdivisions A through C are in the BOP Policy, but subdivision D was not addressed in the remedies at bar. That last situation is the "catch-all" provision and it is that provision under which Mr. Welch is seeking relief, which reads as follows:

...(D) "Other Reasons: As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason **other than, or in combination with,** the reasons described in subdivision (A) through (C)." (Emphasis added.)

[USSG § 1B1.13 n.1]


All this gets tied together by the language in § 3582 itself. "[T]he court ... may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after **considering the factors** set **forth in** section 3553(a), to the extent that they are applicable, if it finds that: --- (i) extraordinary and compelling reasons warrant such a reduction; ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" (Emphasis added.)

Now, because the amendments to § 3582(c)(1)(A) allow <u>either</u> the director of the BOP, <u>or</u> the Defendant to file a motion for compassionate release, the catch-all provision's portion stating that relief could be granted "upon motion of the director of the Bureau of Prisons" is now inconsistent with the law.

A majority of district courts have embraced this position for both COVID-19 cases <u>and</u> for correcting "stacked § 924(c)'s":

For guidance in coronavirus § 3582 cases **involving former** sex offenders with federal child pornography convictions like Mr. Welch, <u>see</u>, for example <u>United States v. Sawicz</u>, E.D. New

4

York, 08-cr-287 (April 10, 2020)   (Sawicz's child pornography conviction   did not involve violence or physical contact and neither did his failure to register.  "He did not pose a danger to the safety of any other person or the community, and was quarantined for 14 days to live with his parents.  He would pose little, if any risk to the public."  Motion granted and sentence reduced to time served.)  See also, United States v. Fischman, N.D. Cal. Case No. 4:16-cv-246 (May 2020)  (Like Welch, Fischman was serving a conviction for simple possession of child pornography.  Like Sawicz, Fischman's district court judge granted relief explicitly saying possession is non-violent.)

For 924(c) cases in a § 3582 context, see United States v. Young, M.D. Tenn., Case No. 00-cr-2-1 (March 4, 2020);  United States v. Maummau, Dist. Utah, Case No. 08-cr-00758 (Feb. 2020);  United States v. Cantu-Rivera, S.D. Tex., Case No. 1:05-cr-458-1 (June 17, 2019); United States v. Wade, C.D. Cal., Case No. 2:99-cr-257 (April 13, 2020);  United States v. Brown, S.D. Iowa, Case No. 4:05-cr-00227-1 (Oct. 8, 2019); and United States v. Urkevich, D. Neb., Case No. 8:03-cr-37 (Nov. 14, 2019).

The purpose of FSA 2018 was to "increas[e] the use and transparency of compassionate release."  As such, continuing to give the BOP Director veto over those requests would defeat that goal.  Id.


DOCTRINE OF CREDIT FOR TIME AT LIBERTY

The basic principle to assess another person is character. Character is commonly defined by who you are and what you do

when no one is looking.   The doctrine of time at liberty has this principle as a counter-poise to governmental negligence or mistake.   That is, error causing a person who should be in prison to not be, through no fault of his own.

The doctrine of credit for time at liberty is an exception to the general requirement that credit cannot be given for anything other than a defendant's official detention.   Ninete v. Thomas, 607 F. Supp. 2d 1201 (D. Or. 2009).   But a convicted person is entitled to credit against his sentence for the time he was erroneously at liberty, provided that there is a showing of simple or mere negligence on behalf of the government and provided the delay in execution of the sentence was through no fault of the defendant. Id.   See also, Ware v. Merlak, 2018 U.S. Dist. LEXIS 126927 (2018)   (citing Myles v. United States, 1999 U.S. App. LEXIS 19787 (6th Cir. Aug. 16, 1999).

As the Motion at bar highlights, the Sixth Circuit and the prosecution intimated Welch had been erroneously at liberty since 2007, thus "dodging a bullet."


II  FACTS


Defendant is a post-abortive dad to three children (1990, 1996, 2002), and the miscarriage of two more (both in 2006). [Exhibit B].

His testimony has been told several times over the years: "I am responsible for all my criminal behavior.   If I knew then what I know now, I would have sought healing as a post-abortive

father from places like Rachel's Vineyard and LifeDynamics.com, as I have now ... my crimes show the visible casualties of sexual rebellion ... because of the complex grief of losing the unseen victims whose cries were never heard." Id.

Mr. Welch describes his failure to save the children he was supposed to protect. For nearly a decade (from 1997 to 2007) "I believed and lived the lie I learned at college and beyond: that sex was for entertainment purposes only." It takes two to tango, as it were, and Welch admits his selfish immaturity in 1990 in failing to stop the abortion of his first son, Max; his later silence in 1996 in the face of his wife's decision to abort their daughter Aubrey for her music career. These drove anger and rebellion caused by the objective losses of life. Id. But it was double miscarriages of Alex and Luke in 2006 which triggered his instant offense conduct. Then a miracle happened.

In late 2007 Mr. Welch was able to hold his first-born son, Ian, and later William (Liam) in 2009. Thus, the life of this gravely wounded father began to heal. Id.

At the time the federal government finally sorted out the recycling of the state case, Mr. Welch was "no longer at war, not even with myself." [Doc. 49].

The point is, Defendant was a mess when he brought this up in hand-written objections to the Probation Officer's PSR, and to his attorney. [Bates # 716 - 723, Welch v. Dobias, W.D. Mich. No. 1:17-cv-38-GJQ-TPG]. He also brought it up in his 2255, W.D. Mich. 2:13-cv-115, Doc. 1-6, but to no effect.

It was not until he entered the Confraternity of Penitents

in 2014 and began living a Rule of Life, and speaking on post-abortive fatherhood that he could make the best use of recovery time in prison; recovery  that began with the live birth of his sons in 2007 and 2009.   According to LifeDynamics.com (last accessed Summer 2015), their research study, and that of Project Rachel, "Complex Grief" causes remarkably higher rates of sexual misbehavior (including illegal behavior), mania, depression, drug and alcohol abuse, prostituion, same-sex behavior, etc., not just in post-abortive mothers (such as coldness or inability to bond with their later child), but also at high rates in fathers.  These manifestations are of a grief that is clinically defined as so severe it does not follow the Kubler-Ross grief cycle. Id.

The short version of all this is one can come from a good childhood and family with an incompletely formed conscience, and enter a life of destructive consequences thinking and believing that that is what adults are supposed to do to support women.


Health History

Mr. Welch has a long history of asthma.  (See attached medical records from both Wisconsin, and the BOP's "chronic care.")  He takes an Albuterol Inhaler and is on Naproxen 500 mg for severe back pain. [Exhibit C].

One particular health record bears mentioning:  This Court may find a narrative in the PSR, partially quoted from Reality Counselling Services (Lansing, Michigan, from Mr. Welch's 2000 misdemeanor attempted contact, fourth-degree sex offense).  [PSR

¶40].   The PSR omitted to include the follow-up sessions, only discussing the <u>intake</u> report (written by a college-level intern).   The follow-up sessions revealed that Mr. Welch "mistakenly identified his father as an alcoholic who behaved in emotionally abusive ways."   The "ongoing, concentrated emotion" and "expressions and tones describing him [his father]," were nothing more than typical stress of a high-school teen getting ready to go to college.   This was repeated at allocution in the instant case.   [ST at 14].

In context, all heavy drinking from 1997 to 2000 had completely disappeared after 2001.   On a separate matter, there is evidence in his state file from 2007 of taking a small amount of low-dose Hydrocodone (or Vicodin) from his wife Krista's prescription for his back and leg pain, but not drinking alcoholically and not as an addictive outlet.

While at liberty in 2010, the record demonstrates that Mr. Welch occasionally consumed "a glass or 2 of wine," under normal circumstances, as recorded by Dr. Tkachuk in 2010. [Exhibit C]. But the anxiety of jury trial in the instant case meant Mr. Welch "did not want to do that" (meaning he did not want to <u>misuse</u> alcohol for anxiety). <u>Id</u>.   He was both able and willing to stop on his own before trial and the record shows he asked for and received from his primary care physician a prescription for 0.25 mg Alprazolam (to be well-rested for trial without using alcohol).   <u>Id</u>.   Mr. Welch has not had an alcohol problem since 2001 and was able to drink normally, stopping when environmental stress was too high.   The PSR omits to include

this fact. Id. The Special Condition of Supervised Release should be modified to "no excessive use of alcohol."

At arrest in 2010, federal agent Tom Miller testified that the Welch home was very well kept and the four-member family were all together. He also testified that a forensic exam of Mr. Welch's computer right then and there revealed absolutely no pornography. [TT at 329]. Based on the agents findings in 2010, after having been at liberty for three years, Mr. Welch demonstrated that while no one was looking, he lived a reformed, clean life. Id. & Exhibit B. The Special Conditions of Supervised Release should be modified to unrestricted computer use subject to warrantless search by probation while on supervised release.

Post-Incarceration, Welch approached Psychology Services at least twice for complex grief issues related to the loss of his children to abortion. As research from LifeDynamics and Project Rachel reveal, the worst manifestations of grief of this kind strike the conscience of post-abortive parents even decades after the abortion itself. Unaddressed, disordered behavior follows.

The Psychology Department (i.e. Patrick Cook) acknowledged complex grief, but suggested other outlets. [Exhibit D]. In addition to the Confraternity of Penitents, which has been Mr. Welch's mainstay and best program. Celebrate Recovery is a faith-based group he attends at Marion. [Exhibit E]. Mr. Welch presented testimonial recovery and helped others in their recovery. In addition, Mr. Welch participated in and completed

10

a BOP drug-treatment course, as well as BOP sex-offender pre-treatment course, and group therapy. [Exhibit G].

Welch experienced deep healing and shared the recovery path caused by abortion as it relates to sexual rebellion with countless others, both in prison and out.

Post-Incarceration Work and Employment

Mr. Welch maintained his Master Electrician credentials through the Wisconsin Contractor's Institute, with access to update his Michigan Master Electrician's license upon release. [Exhibit H]. These form the foundation of his career as an electrical engineer (licensed P.E.).

He has maintained an excellent work record in UNICOR. [Exhibit H]. Most notably, he has made use of his abilities as an electrical engineer and paralegal writer at that facility.

His factory manager has said:

"Mr. Welch helps others on a regular basis. He is a 'go-to' guy for goal accomplishment for both Staff and inmates. Based on observed interactions, and those familiar with him from Custody, Education, Psychology and Religious Services departments, they acknowledge Mr. Welch is a mature, well-adjusted man who has overcome the hardships of incarceration and has a grown mindset ... Considering his PSR and Case Manager's input, he has no issues using a computer and is authorized for all forms of communication at the BOP (email, phone, Windows OS, Office, SAP, etc.)

"In 24 years as a prison factory supervisor, I have come to

understand characteristics that keep inmates from returning to prison.  I've seen the ones who lack these charcteristics that keep inmates from returning to prison.  I've seen the ones who lack these characteristics come back.  The characteristics include responsibility, dedication to growth, and teamwork. Eric Welch demonstrates mastery of these characteristics.  An inmate interested in personal growth is common.  An inmate engaged in personal growth is rare.  I am confident he will find success in life and that he will not only avoid returning to prison, he will be a positive influence to others."
[Exhibit H].


Post-Incarcerated Education

Mr. Welch has completed several of the Prison's ACE courses, earned a Microsoft Office Certification, and became an American Standards of Quality ("ASQ") associate.  He also taught Electrical Theory, Renewable Energy, and Legal Writing. [Exhibit F].

In addition, he has completed an Advanced Paralegal Course in Criminal Law from Adams State University. [Exhibit I].  He is currently enrolled in both Constitutional Law, and Family Law, both from Adams State University's advanced paralegal correspondence program. Id.


Helping Others

Mr. Welch has assisted or directly written legal work for several inmates who subsequently received relief and shorter

sentences in the federal arena:

a.   Amos v. Walton, S.D. Ill., Case No. 12-cv-141-DRH (Dec. 13, 2013) (Several months of jail credit erroneously calculated by the BOP, remedied under habeas corpus § 2241).

b.   Snodgrass v. United States, S.D. Ill. No. 12-cv-50-JPG (Nov. 20, 2013) (vacated double jeopardy count of possession of child pornography under § 2255).

c.   United States v. Dixon, N.D. Okla. No. 04-cr-128-H (Apr. 17, 2015) (§ 3582(c)(2) sentence modification for "two-point" drug reduction).

d.   Ellerman v. Walton, Seventh Circuit Appeal No. 14-1501 (Apr. 21, 2014) (actual innocence of ACCA claim, denied relief, but after acknowledging Mr. Ellerman was erroneously sentenced as ACCA, the Seventh Circuit recommended him for Presidential Clemency).

e.   Rhodes v. Warden, USP-MARION, S.D. Ill, Case No. 3:17-cv-562 (Nov. 5, 2019) (Vacated ACCA and Career Offender status under Mathis v. United States, 136 U.S. 2243 (2016) using a habeas corpus § 2241.).

f.   June 3, 2016 Presidential Commutation granted to Gary A. Lott (sentence commuted from Life to 20 years).

g.   James Kammeyer, 20118-081 (restoration of seven months concurrent state-fed incarceration credit through BOP administrative remedies.)
[Exhibit L].

13

Release Strategy

Mr. Welch has a place to stay with his parents. [Exhibit J]. His professional credentials have been able to be updated, through the continuing education he completed while in prison.

ACE Electronics, Inc., of Troy, Michigan visited the Prison several times in 2018 - 2019 and Nish Patel offered him a job (or at least an opportunity to interview for one) when Welch releases.  He may also shop out his paralegal skills to local attorneys.


THE ELEPHANT IN ROOM: THE BOP AND COVID-19

The coronavirus disease 2019 (COVID-19) is rapidly spreading in all parts of the United States, including its prisons.  There is no vaccine or cure for this deadly disease.  The Centers for Disease Control ("CDC") recommends protecting oneself from the disease by frequent handwashing, frequent sterilizing of surfaces, and individuals remaining at a distance of at least six feet from each other.  It is impossible to do that in this facility.

Since the BOP nation-wide lock-down (dubbed "shelter-in-place"), began March 31, 2020, the conditions at Marion are as follows:

1.  Sequestering one housing unit for 70 inmates created by dispersing current inmates into triple-bunked units to create a "quarantine unit."


2.  There are nine remaining housing units. The three-man cells

are on 23-hour lock-down, with one hour for phone, email, shower, and recreation. The single-man cells are on 21-hour solitary confinement with three hours for phone, email, and shower. There is no recreation for single-man cells except one day a week for one and a half hours.

3. Despite these measures, over 100 inmates from nine units commingle at UNICOR. Over a dozen from the units work at Facilities, with several more at food service, and so on.

4. Despite efforts to segregate units internally, all "working inmates" and orderlies commingle without masks after 4:30 p.m. in common areas.

5. Not all staff members wear masks, and inmates commingling at work occasionally remove masks.

6. When an inmate leaves a single-man cell for transfer or release, another inmate from a different unit is moved in, exposing all to cross-contamination.

7. Despite how the warden's best efforts may seem "on paper" to outsiders, the actual reality is that CDC guidelines are impossible to follow to prevent asymptomatic spread of the disease.

8. Early in the COVID lock-down, the Office of Inspector

General set up a TRULINCS/CORRLINCS email called "COVID-19 OIG" so inmates could report unsafe conditions in light of the coronavirus. But by mid-May it was removed, presumably because of the deluge of concerns and the BOP's inability to handle the crisis without "de-densifying" its population.

9. An inmate in Mr. Welch's unit (Charles Millard, Jr. # 50585-408), tried to complain in an email to the warden about staff not wearing masks (civilians are the only ones who bring the disease into a locked-down facility). But inmates witnessed Millard retaliated against, his cell ransacked by S.I.S., property stolen and discarded, and so on. Welch did not mention this in the filings below in order to avoid further retaliation at the local level. This is commonplace at Marion. See, Welch v. Sproul, S.D. Ill. Case No. 3:19-cv-1344-SMY (Feb. 28, 2020).

10. There are random temperature checks, but staff will not say exactly how many inmates have been tested. At the time of writing (June 26, 2020), staff and inmates said Marion imported the coronavirus COVID-19 inside the prison with its first few "positives."[**]

## III DEFENDANT IS ELIGIBLE FOR SENTENCE MODIFICATION TO IMMEDIATE RELEASE

Typically, the government will argue about how horrible a

[**] As of 6/26/2020, one staff and two inmates. Safety Officer Litton is responsible for tracking.

defendant's past conduct was, acknowledging the crime, but usually out of context with the reasons why, and the strides made since then.

At bar, Mr. Welch maximizes responsibility and admits he walked in the ways and customs of pagan hedonism promoted in the culture he learned in college and beyond. He tried (but failed) to convey at sentencing that there was some sort of divine justice at work for failing to protect his unborn children (abortion as the female partner's back-up birth control ends up as the ultimate character and conscience distorter for men and motivates instrumentalizing the conjugal act.)

The state of Michigan told Mr. and Mrs. Welch in 2007 that they could move forward with their family without further legal problems, but that did not happen. [Exhibit K]. This confusion between fed-state and ultimate error in causing incarceration later is something that Mr. Welch feels could be described as divine justice. From that perspective, AUSA Paul Lochner was merely serving as God's instrument. [Exhibit B].

There are now cases of coronavirus at Marion Prison where Mr. Welch, a chornic asthmatic, is housed. It may be a higher justice to permit his children to see him sooner rather than later. They have a strong relationship and speak on telephone daily and by email weekly. Movant requests modification of sentence as outlined in the Conclusion.

## IV  CONCLUSION AND RELIEF REQUESTED

The text of § 3582(c)(1)(A)(i), invokes post-incarceration fact-finding under § 3553(a). Taken together with defendant's chronic asthma; that COVID-19 at federal prisons like Marion is a real (not imagined) extraordinary circumstance threat; and consideration of the principles of credit for time spent at liberty, this court has sufficient reason and authority, if it so chooses, to provide relief. For the reasons contained in both the Motion for Sentence Modification, and Brief in Support of Modification, Defendant prays the Court grant the following:

1. Immediate release to Time Served, to live with his parents, George and Susan Welch (see Exhibit J), in the Eastern District of Michigan.

2. In recognition of successful completion of supervised release/probation on the associated state of Michigan (the res gestae) case,[**] as well as defendant's reformed life while erroneously at liberty all providing sufficient factual basis in support of the following modifications to Special Conditions of Supervision (Doc. 59: JUDGMENT, PageID#159):

#1 (substance abuse treatment) should be deleted, and #2 be modified based on the nature and characteristics of the defendant, to say, "The defendant shall not excessivly use alcoholic beverages."

#3 and #4 be modified to say "The defendant shall participate in a faith-based program of mental health treatment if a board-certified and licensed Christian psychologist assessment deems participation in a program of mental health treatment is warranted. This program shall specialize or have experience with healing from post-abortive parenthood."

[**] When Welch was 37, he is now 50 years old.

#6 & #7 (no contact with minors under the age of 18) be stricken. Welch's offense conduct involved prostitution, not grooming children from the general public.[**] What is more, the condition unconscionably makes no exception for defendant's own children or relatives and bars him from his parental rights under the "liberty" clause of the Fourteenth Amendment, as explained in Meyer v. Nebraska, 262 U.S. 390 (1923), such as his attendance at school functions and right to bring up children free from unwarranted government intervention.

#8 be stricken for having no relevance to either Welch's offense, nor his nature or characteristics as a defendant.

#10 & #11 be modified to say: "The defendant may use a computer or have access to online services subject to search by the probation office while on supervised release." Defendant's time at liberty and behaving appropriately, alongside the reasons in the brief and motion justify this modification.

3. Term of Supervised Release. (Id. at PageID#158). This should be modified to say "Upon release from imprisonment, the defendant shall be placed on supervised release for a term of **Three Years**.

4. All other Standard and Special Terms of Supervised Release remain unmodified by this motion.

---

[**] People v. Welch, Houghton Cty. Cir. Case No. 07-2225-FH, Sent. Tr. Aug. 31, 2007 at p.27

July 1, 2020                      /s/ _Eric Welch_
Date Executed                                Eric D. Welch, pro se
Under penalty of perjury pursuant to              USM # 10444-089
28 U.S.C. § 1746, I hereby swear and verify          P.O. Box 1000
that the foregoing is true and correct as an affidavit.   Marion, IL 62959
Further, that it has been deposited this day
in the institution's internal mail system
designed for legal mail under Prison Mailbox Rule,
United States Postal Service, first-class postage prepaid.


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was forewarded via the CM/ECF System upon filing by the clerk, or by United States Postal Service, first-class postage prepaid, upon the following:

Paul Lochner, AUSA
2nd Floor, U.S. Attorneys' Office
1930 U.S. Highway 41 West
Bank Building
Marquette, MI 49855

Eric D. Welch
10444-089
United States Penitentiary
P.O. Box 1000
Marion, IL 62959

 UNITED STATES POSTAL SERVICE. **Retail**



| **US POSTAGE PAID** | |
|---|---|
| **$0.00** | Origin: 62959<br>07/02/20<br>1648600059-12 |

**PRIORITY MAIL 2-DAY ®**

0 Lb 14.40 Oz

**1004**

EXPECTED DELIVERY DAY: 07/08/20

`C020`

SHIP
TO:
110 MICHIGAN ST NW
STE 399
GRAND RAPIDS MI 49503-2317

**USPS TRACKING®NUMBER**

9505 5116 0902 0184 4211 48

U.S. District Court
Western District of
110 Michigan Street
399 Federal Building
Grand Rapids, MI 49

 Special Mail / Legal Mail



Iichigan
IW

03