UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                              No. 2:10-cr-08

      vs.                                       Hon. Paul L. Maloney
                                                           United States District Judge

ERIC DEXTER WELCH,

        Defendant.
_____/

**Government's Response to Defendant's Motion For Reconsideration of Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)**

       Defendant Welch has filed a motion asking this Court to reconsider its decision denying his motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), relying on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion.  This Court should dismiss Defendant's motion, as he does not offer any new evidence that is material to the Court's consideration of his motion, and because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute, even with what he calls "newly discovered evidence."

**I.**       **Factual Background**

       **A.  Defendant's Conviction and Motion**

       On October 5, 2010, after a two-day jury trial, Defendant was convicted of possession of child pornography contrary to 18 U.S.C. § 2252A(a)(5)(B).  (R. 25: Superseding Indictment, PageID.62-64; R. 43: Jury Verdict, PageID.115.)  The Court sentenced him to 168 months' imprisonment and a lifetime of supervised release to follow.  (R. 59: Judgment, PageID.156-161.)

The facts underlying Defendant's conviction can be briefly summarized as follows. In November 2006, a woman contacted the Michigan State Police (MSP) to discuss a conversation Defendant had with her in which he offered to pay her if she could find a minor female for him to have sex with, with an additional cash bonus for every year the girl was under 18 years of age. (Presentence Report (PSR), ¶ 33.)[1] With the woman's cooperation and in conjunction with the MSP and local police, a meeting was set up between Defendant and an undercover law enforcement officer who was posing as a 14-year-old girl. (*Id.*) The meeting was scheduled for May 29, 2007, in Calumet, Michigan. (*Id.*) MSP Troopers intercepted Defendant at the designated meet location. Defendant admitted he planned to have sex with the 14-year-old girl if she was good looking and consented. In return, he would give her $60 and a pack of cigarettes she had requested. (*Id.*)

Defendant gave MSP Troopers permission to search the contents of computers found at his home, as did Defendant's wife. (PSR, ¶ 7.) A subsequent forensic analysis of Defendant's laptop revealed approximately 135 images of child pornography. (PSR ¶ 9.) These images involved children from age 5 or 6 to age 17 or 18, with the majority of images depicting girls from ages 12 to 14. (PSR, ¶ 7.) On March 4, 2010, Immigration and Customs Enforcement Agents arrested Defendant at his home. (PSR, ¶ 10.) Defendant admitted that the laptop in question was his and admitted that he had searched for teen pornography, preferring to view pornography involving girls between 14 and 15 years of age. (Id.)

---

[1] Because of the age of the case, the Presentence Report (PSR) was not scanned into the ECF system; accordingly, record citations are impossible. Because the PSR contains sensitive personal information, the government has not submitted it as an exhibit to its response. The government will provide a copy of the final PSR to the Court upon request.

Defendant has two prior sex offender convictions.  Defendant was convicted of Accosting a Child or Immoral Purposes in 2007 (at age 37) for the incident discussed above involving his solicitation of and attempt to have intercourse with a 14 year-old-girl.  (PSR, ¶ 33.)  Defendant was convicted in June 2000 at age 30 of Attempted Criminal Sexual Conduct 4th Degree involving sexual intercourse with a 13-year-old girl.  (PSR, ¶ 32.)  The Court rightly recognized the significant risk he posed to the community and sentenced him accordingly.

Defendant has served approximately 118 months of his sentence, and his projected release date is August 31, 2022.  On July 6, 2020, Defendant filed a motion requesting compassionate release.  (R. 107: Motion, PageID.1297-1305.)  On July 17, this Court denied his motion, noting that Defendant had not demonstrated that he suffers from moderate-to-severe asthma which would place him at higher risk, and that there were only two active cases of COVID-19 at USP Marion.  (R. 111: Order, PageID.1390-92.)  On July 27, 2020, Defendant filed a motion for reconsideration, the gravamen of which involves three issues: 1) his claim that his asthma is, in fact, moderate-to-high; 2) that the number of COVID-19 infections has climbed to 10 cases, demonstrating an inability of USP Marion to contain the spread of the disease; and 3) that the Court did not take into account the § 3553(a) factors when deciding upon his original motion.  (R. 114: Mot. for Reconsideration, PageID.1403-15.)  On July 30, 2020, Defendant filed a motion to supplement his motion for reconsideration, claiming that new evidence showed his asthma to be "high risk or medically complex" and noting the inmate infection count for COVID-19 had increased to 28.   For the reasons set forth below, the government respectfully submits that, despite his efforts, Defendant cannot demonstrate that he suffers from anything more than mild asthma.  Moreover, the government notes that the inmate infection count has dropped since Defendant's motion to supplement, demonstrating USP Marion's successful

efforts to mitigate the spread of the disease. Finally, the government respectfully suggests that a consideration of the § 3553 factors supports the Court's initial determination that compassionate release is not appropriate in this case.

### B. Defendant Has Exhausted His Administrative Remedies

As the Court noted in its original Order, Defendant submitted a request for compassionate release to the Warden of USP Marion on April 24, 2020. (R. 111: Order, PageID.1391.) The Warden denied his request on June 1, 2020. (*Id*.) Accordingly, Defendant has exhausted his administrative remedies and his initial filing was proper.

### C. BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is a highly infectious illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.  On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.  Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Nine of the Action Plan. The current modified operations plan implements numerous precautionary measures, including the suspension of most staff training and all non-essential staff travel; adoption of social distancing, face covering, and other health and safety requirements; and formulation of detailed policies governing inmate movement, including necessary quarantining measures. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the

5

pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.  As of this filing, BOP has transferred 7,477 inmates to home confinement, which is an increase of over 200% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.  BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead.  But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations.  For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.  It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry.  It must marshal its resources to care for inmates in the most efficient and beneficial manner possible.  It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times.  And it must consider myriad

other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.     Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds

that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[2]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).[3]

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

[3] USSG § 1B1.13 (Policy Statement) has not been amended since Congress enacted the First Step Act. This has caused some district courts to find that courts may grant relief under § 3582(c)(1)(A) based on Application Note 1(D) ("Other Reasons")—even though "Other Reasons" is limited by the phrase "as determined by the Director of the Bureau of Prisons." *See United States v. Handerhan*, 789 F. App'x 924, 925 n.1 (3d Cir. 2019) (noting division). That is

### III. Arguments

This Court should deny Defendant's motion for reconsideration with prejudice on either of two independently sufficient grounds. First, Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction; second, he has not met his burden to show that a reduction is warranted in light of the danger that he would pose to the community and the relevant § 3553(a) factors.

#### A. Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

In this case, Welch claims that he suffers from asthma, which makes him more vulnerable to becoming seriously ill should he contract COVID-19. This contention does not establish "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1)(A) and so Defendant's motion cannot be granted.

Defendant's BOP medical records reflect that he suffers from asthma.[4] An entry in Defendant's medical record on May 31, 2019, reflects the "asthma, unspecified" diagnosis and notes "ASTHMA – doing very well, with only rare use of albuterol reported lately."[5] It also notes "peak flow and O2 (oxygen) saturation are normal in office." It also notes that Defendant has no medical restrictions and that he refused immunizations. A later entry on October 11, 2019, reflects that, despite Defendant's professed concern for respiratory illness, he declined an influenza vaccine. In a later evaluation on November 21, 2019, Defendant's record notes "ASTHMA, for which he is prescribed an albuterol inhaler to use as needed. Estimates he uses

---

contrary to the express language of 28 U.S.C. § 944(t), which gave the Sentencing Commission, not the courts, the authority to determine what constitutes "extraordinary and compelling reasons" for a reduction of sentence pursuant to § 3582(c)(1)(A). *See United States v. Coffman,* 2020 WL 2614634, *4 (E.D. Ky. May 22, 2020) (citing *United States v. Lynn,* 2019 WL 3805349 (S.D. Ala. Aug. 13, 2019)). *See also United States v. Saldana*, -- F. App'x --, No. 19-7057, 2020 WL 1486892, *3 (10th Cir. Mar. 26, 2020) (district court lacked jurisdiction to grant compassionate release for reason not listed in USSG 1B1.13 or BOP's program statement).
[4] Defendant's medical records from the BOP are not attached for privacy reasons, but are available to the Court upon request.
[5] Defendant provided the first page of the medical record entry for May 31, 2019 (R. 109-4: Def's Ex. C-1, PageID.1346.), but did not provide the additional pages with this entry noting his rare use of Albuterol.

the inhaler about once a week on average during allergy season.  States he really hasn't used in about 6 months."  Another entry in Defendant's medical record shows that on April 22, 2020, two days before he submitted his compassionate release request to the Warden, he made a request to the medical staff that they "please print and deliver my records pertaining to my status of chronic care for asthma."  Finally, an entry in Defendant's medical record from May 19, 2020 states "ASTHMA – stable, with mild asthma, no overuse of albuterol is noted."  Defendant's PSR reflected that he used an Albuterol inhaler to treat bronchitis, but made no mention of a history of asthma.  (PSR, ¶ 46.)

Although Defendant suffers from asthma, the CDC has identified only moderate-to-severe asthma as a condition that "might" create increased risk.[6]  In addition, recent information about the COVID-19 virus suggests that those who have asthma do not suffer the previously-anticipated severe and life-threatening manifestations from infection.[7]  As noted above, most of Defendant's BOP medical record reflects a diagnosis of "asthma, unspecified."[8]  A generalized claim of asthma, without more, is not an extraordinary and compelling reason for a sentence reduction.  *United States v. Washington*, 2020 WL 1969301 (W.D.N.Y. Apr. 24, 2020).  The latest mention of asthma in Defendant's BOP medical record describes his asthma as "mild."  Mild asthma is not a condition identified by the CDC as a comorbidity factor.

---

[6] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  (last modified August 14, 2020).  Originally, the CDC's heightened risk criteria included "moderate-to-severe asthma."  Current CDC criteria lowered moderate-to-severe asthma to a factor that "might" elevate risk of developing severe illness.

[7] *See* University of Wisconsin-Madison School of Medicine and Public Health, *Respiratory Allergies and Allergic Asthma May Have Protective Mechanism in Covid-19, available at* https://www.med.wisc.edu/news-and-events/2020/april/allergies-asthma-may-reduce-covid-19-risk-/; Medpage Today, *Asthma and COVID-19 Risk:  Good, Bad, or Indifferent?, available at* https://www.medpagetoday.com/infectiousdisease/covid19/86323 (research indicates asthma patients with COVID-19 do not appear to have a higher rate of hospitalization or mortality compared with other COVID-19 patients.)

[8] The National Asthma Education and Prevention Program has identified four classifications for asthma: intermittent, mild persistent, moderate persistent, and severe persistent. *See* University of Michigan Health Library, available at https://www.uofmhealth.org/health-library/hw161158.

Moreover, at least one court has found that although BOP has classified any inmate who self-reports as asthmatic as high risk, a defendant with chronic but controlled asthma did not establish extraordinary or compelling circumstances. *See United States v. Ramos*, No. 14 CR. 484 (LGS), 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (finding that defendant who was "forty-one years old and represents that he suffers from chronic and severe asthma" had not demonstrated "extraordinary or compelling circumstances" warranting compassionate release).[9] In addition, despite his mild asthma, Defendant declined a vaccination for influenza in October 2019, despite the pulmonary complications that can arise from influenza. His medical duty status reflects no physical limitations for sports, cardiovascular exercise, weightlifting, or for work. In sum, Defendant has not sustained his burden of demonstrating that the comorbidity condition he identified constitutes a circumstance warranting his release. For all these reasons, Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c).

As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy

---

[9] Many other courts have denied compassionate release where asthma is the only condition presented. *See, e.g., United States v. Hernandez*, 2020 WL 2745697 (E.D. Cal. May 27, 2020) (lengthy review of medical records supports conclusion that asthma is not moderate to severe); *United States v. Wheeler*, 2020 WL 2801289, at *3 (D.D.C. May 29, 2020) (asthma is mild); *United States v. Miles*, 2020 WL 3256923, at *3 (E.D. Cal. June 16, 2020) ("While defendant presents evidence to support the conclusion his asthma is chronic and something he has lived with since childhood, he does not present evidence or argument his condition is 'moderate to severe.' BOP's clinical practice guidelines suggest those suffering from 'moderate persistent' to 'severe persistent' asthma conditions exhibit, at a minimum, daily symptoms, nighttime awakenings, some limitation or interference with normal activity and varying degrees of lung functionality."); *United States v. Murphy*, 2020 WL 2507619 (E.D. Mich. May 15, 2020) (Elkton inmate; asthma is controlled by inhaler use); *United States v. Abram*, 2020 WL 3097259 (E.D. Mich. June 11, 2020) (Elkton inmate; asthma is not moderate or severe, but rather is well controlled with inhaler).

statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d. Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745 at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."); *United States v. Wright*, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020) ("The Court stresses that the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances. Rather, those circumstances are applicable to all inmates who are currently imprisoned and hence are not unique to any one person. The Court cannot release every prisoner at risk of contracting

COVID-19 because the Court would then be obligated to release every prisoner.").[10] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I).

But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he is released than if he remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his institution. As of the date of the filing of this motion

---

[10] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

(August 17, 2020), four inmates are infected with COVID-19 at USP Marion where Defendant is housed and two have died.  *See* Federal Bureau of Prisons, *COVID-19 Cases*, *available at* https://www.bop.gov/coronavirus/ (last checked August 17, 2020.)  In contrast, Tuscola County, Michigan, in which the town of Clifford is located (and where Defendant proposes to live) has 386 cases and 29 deaths.  *See,* Coronavirus – Michigan Data, *available at* https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html  (last checked August 17, 2020.)

If Defendant's representations in his motion for reconsideration are correct, and the number of infected inmates on July 23, 2020, was 28 (R. 115: Def's Mot. to Supp. Mot. for Reconsideration, PageID.1422.), it appears that USP Marion is doing a commendable job of mitigating the spread of the virus and treating the inmates who have contracted it, given that the number of infected inmates has dropped to four as of the time of the filing of this response. Courts have denied relief where it appears that BOP has implemented an effective plan for dealing with the spread of the virus.  *See, e.g., United States v. Elebesunu*, 2020 WL 3791978 at *2 (D. Md. July 7, 2020) (denied notwithstanding diabetes and hypertension, in light of 3553(a) factors, and few cases at FDC Philadelphia; "Under circumstances such as these where the number of cases at the facility is low and BOP appears to have controlled the spread, the imminence of the risk to Ms. Elebesunu is diminished and weighs against granting compassionate release."); *Untied States v. Parker*, 2020 WL 4018924, at *2 (D. Nev. July 16, 2020) ("Terminal Island was one of the first federal prisons to suffer an outbreak, [but] there are currently only six active cases of infected inmates at Terminal Island, the BOP has implemented a detailed COVID-19 response plan for federal inmates, and the reported numbers at Terminal Island suggest that the plan is effective.")

In sum, Defendant has failed to establish extraordinary and compelling reasons for a reduction of his sentence, even in light of the additional information he provides.  Accordingly, the totality of the circumstances demonstrate that Defendant's motion for reconsideration should be denied.

14

### A. Defendant Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against His Release.

Alternatively, Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone.  As noted above, Defendant's possession of child pornography, a very serious offense, demonstrates his disregard for the law and for the safety of others and their mental well-being, especially in light of his prior crimes against minor children. Defendant has been a prodigious litigant of his conviction.  He did not accept responsibility for his deplorable action before trial and he has never admitted in his many post-trial filings that he did what a jury found beyond a reasonable doubt he did:  knowingly possess child pornography. The closest he has come to admitting his guilt is found in his brief in support of his original motion in which he states "I am responsible for all my criminal behavior."  (R. 109: Brief in Support, PageID.1312.)  While technically true, this is hardly an acceptance of personal responsibility for possessing child pornography or a recognition of the lasting harm caused by that offense.

Moreover, as noted above, he has a history of sexual predation of minor children.  One of his counselors reported "it is paramount to recognize that Mr. Welch does have sexual interest in young females."  (PSR, ¶ 51.)  An ex-spouse reported that Defendant had secretly accrued significant charges on two of her credit cards, using both 1-900 phone sex services as well as phone services to arrange sex with other women.  (PSR, ¶ 48.)  She opined "he is incapable of being honest with himself and others due to his mental illness, and thus there is a very low hope

of his recovery." (PSR, ¶ 53.) She further noted that "his previous consequences have not made clear to him that he has a serious problem." His wife at the time of his trial described him as a "sociopath who is flat emotionally and continually attempts to manipulate people into believing his version of the truth." (PSR, ¶ 54.) This sentiment was echoed by one of Defendant's therapists, who described Defendant as "a cunning young man who will, most likely, attempt to maneuver the counseling so that he pleases the counselor, whom he hopes will like him and think highly of him." (PSR, ¶ 56.) All of this paints a picture of a man who has a high likelihood of recidivism, and was likely a significant factor in the district court's decision to place him on supervised release for the rest of his life.

Although his employment activities with UNICOR and his educational endeavors while at USP Marion are commendable, the nature and circumstances of Defendant's crime, his refusal to accept responsibility, his prior history of child sexual exploitation, and his prior psychiatric or counseling evaluations strongly militate against his release. In light of Defendant's record and the totality of relevant circumstances, this Court appropriately denied Defendant's original motion and should deny the Defendant's motion for reconsideration.

## Conclusion

Even in light of what Defendant claims to be newly discovered evidence, he has failed to sustain his burden of demonstrating extraordinary and compelling reasons for compassionate release. His mild asthma and a handful of positive cases in USP Marion do not rise to that level of proof. In addition, consideration of the § 3553(a) factors, including the seriousness of the offense, the need for deterrence, the need to protect others, and the history and characteristics of the Defendant amply demonstrates the inappropriateness of compassionate release in this case. For these reasons, this Court should deny Defendant's motion for reconsideration of its prior decision denying his request for compassionate release.

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

*/s/ Paul D. Lochner*
PAUL D. LOCHNER
Assistant United States Attorney
1930 U.S. Hwy. 41 West
Marquette, MI 49855
(906) 226-2500

**Certificate of Service**

I certify that on August 17, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system. I also certify that I have mailed this document by US mail to the following:

Eric Dexter Welch
#10444-089
USP Marion
U.S. Penitentiary
P.O. Box 1000
Marion, IL 62959

*/s/ Paul D. Lochner*
PAUL D. LOCHNER
Assistant United States Attorney